# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Ruby Hicks,

        Plaintiff,                       Case No.  1:16cv621

      v.                            Judge Michael R. Barrett

Doris Scott, *et al.*,

        Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendants Doris A. Scott, Justin T. Moore, Benjamin M. Schneider, and the City of Cincinnati's Motion for Summary Judgment. (Doc. 41).  Plaintiff Ruby Hicks, Administrator of the Estate of Quandavier K. Hicks, filed a Response in Opposition (Doc. 44) and Defendants filed a Reply (Doc. 48).  Plaintiff was also permitted to file a Supplement to its Response in Opposition.  (Doc. 49).

## I.  BACKGROUND

This case arises out of the fatal shooting of Quandavier Hicks ("Hicks") on the night of June 9, 2015.  The claims are brought by Hick's executor.  Defendants are the Cincinnati Police Officers involved in the shooting – Doris A. Scott, Justin T. Moore, Benjamin M. Schneider – and the City of Cincinnati.

The events of that night began shortly before 11:00 p.m. when a couple, Raquella Norman and Jonathan Jones, made a 911 call.  (Doc. 36, Doris Scott Dep., PAGEID# 364).  Officers Scott and Moore responded to the call and spoke with Norman and Jones at their home in the Northside neighborhood of Cincinnati.  (Doc. 36, Scott Dep., PAGEID# 365).  Norman and Jones told the officers that Hicks had driven past

their house and threatened to kill them after they accused him of stealing from their house. (Doc. 36, Scott Dep., PAGE ID# 364). Jones was scared because Norman was pregnant, and Hicks had keys to their house. (Doc. 36, Scott Dep., PAGE ID# 365). Jones also explained that he knew Hicks had guns. (Doc. 36, Scott Dep., PAGE ID# 365).

Jones told the officers that Hicks lived nearby on Chase Avenue. (Doc. 36, Scott Dep., PAGE ID# 365). Jones did not have an exact address, but he told the officers it was near the Marathon gas station. (Doc. 36, Scott Dep., PAGE ID# 365). Jones and Norman described the car driven by Hicks as being a silver Ford Focus with a damaged side view mirror. (Doc. 36, Scott Dep., PAGE ID# 364).

Cincinnati Police Officer Christopher Loreaux was dispatched to Chase Avenue and found the vehicle. (Doc. 42, Christopher Loreaux Dep., Page ID# 996-999). Officer Schneider joined Loreaux on Chase Avenue. (Doc. 42, Loreaux Dep., PAGE ID# 1000). Officer Schneider felt the hood of the car and noticed it was hot, which indicated to him that it had been driven recently. (Doc. 38, Benjamin Schneider Dep., PAGE ID# 702). The officers did not have an address for Hicks in their database, and when the officers ran the license plate for the Ford Focus, the owner came back as being Ariel Wilson. (Doc. 38, Schneider Dep., PAGE ID# 702; Doc. 42, Loreaux Dep., PAGE ID# 1006).

A woman emerged from the side of the house at 1751 Chase Avenue and went to the Ford Focus. (Doc. 38, Schneider Dep., PAGE ID# 702). Officers later learned that this woman was Ariel Wilson. (Doc. 42, Loreaux Dep., PAGE ID# 1006). The officers questioned Wilson, who told the officers that she was hanging out with her

boyfriend "Jason" up in the second floor apartment, she had not driven the car recently, she had not loaned the car to anyone recently, and did not know Hicks. (Doc. 38, Schneider Dep., PAGE ID# 702-703). Schneider was skeptical of her story because he knew the car had been driven recently and Wilson's statement that there was another Ford Focus with a damaged side view mirror which is often parked in the same area "just did not ring accurate." (Doc. 38, Schneider Dep., PAGE ID# 703). Because the officers had no reason to keep Wilson, they let her leave. (Doc. 42, Loreaux Dep., PAGE ID# 1001).

Soon thereafter, Officers Scott and Moore arrived. (Doc. 42, Loreaux Dep., PAGE ID# 1001). While the four officers were standing on the sidewalk outside 1751 Chase Avenue, they heard a man's voice call out "Ariel" from 1751 Chase. (Doc. 42, Loreaux Dep., PAGE ID# 1009). The officers decided that this person must be Hicks. (Doc. 36, Scott Dep., PAGE ID# 366). The officers went to 1751 Chase in order to locate Hicks and to talk to him. (Doc. 36, Scott Dep., PAGE ID# 367).

The building at 1751 Chase is a multi-family house with a first-floor and second-floor apartment. (Doc. 36, Scott Dep., PAGE ID# 367). The officers went to the side of the building where the entrance to the second-floor apartment is located. (Doc. 36, Scott Dep., PAGE ID# 367).[1] That door was closed, but not locked. (Doc. 36, Scott Dep., PAGE ID# 367, 404).[2] When Officer Scott knocked on the door, it pushed open

---

[1]Officer Scott testified: "I knew I heard the voice from what I thought was the second floor. So my experience running the beat leads me to believe that the second floor entry would be on the side." (Doc. 36, Scott Dep., PAGE ID# 395).

[2]Defendants explain that the photo Plaintiff sets forth purporting to show multiple locks on the side entry door (Doc. 44-6, PAGEID# 1218) was not what the door looked like on the night Hicks was shot. Defendant explains that the photos attached to their Motion for Summary judgment were taken the night of the incident.

and Officers Scott, Moore, and Schneider walked in. (Doc. 36, Scott Dep., PAGE ID# 409). Officer Scott testified that it was common for multi-family houses like this one to have a shared entryway inside the door which would then lead to more than one apartment. (Doc. 36, Scott Dep., PAGE ID# 405-407).

Once inside, the officers went up a set of stairs. (Doc. 36, Scott Dep., PAGE ID# 414). The set of stairs had a small landing where the stairs turned. (Doc. 36, Scott Dep., PAGE ID# 414). There were three or four stairs between the landing and the top of the stairs. (Doc. 36, Scott Dep., PAGE ID# 414-415). At the top of the stairs was a hall area with four doors. (Doc. 36, Scott Dep., PAGE ID# 414, 417). None of these doors had apartment numbers on the doors. (Doc. 36, Scott Dep., PAGE ID# 422). There were no door bells or door knockers. (Doc. 36, Scott Dep., PAGE ID# 422). Officer Scott knocked on one of the doors, which was closed. (Doc. 36, Scott Dep., PAGE ID# 367).[3] Officer Scott knocked at least two times. (Doc. 36, Scott Dep., PAGE ID# 430). Officer Scott does not recall identifying herself as a police officer or announcing "Cincinnati Police." (Doc. 36, Scott Dep., PAGE ID# 429). After the last time Officer Scott knocked, she could hear footsteps. (Doc. 36, Scott Dep., PAGE ID# 432). Officer Scott knew someone was coming down a set of stairs behind another door which was immediately to her left. (Doc. 36, Scott Dep., PAGE ID# 367, 432). Officer Scott backed away from the doors, and into the hall area. (Doc. 36, Scott Dep., PAGE ID# 432). The door then opened out into the hall and Officer Scott saw the barrel of a rifle. (Doc. 36, Scott Dep., PAGE ID# 433). Officer Moore could not see Hicks from where he was standing in the hallway, but he saw the barrel of the rifle. (Doc. 37, Justin

---

[3]One of the doors was open and led to a kitchen area, but Officer Scott did not see the open door or the kitchen until later. (Doc. 36, Scott Dep., PAGE ID# 416-17).

Moore Dep., PAGE ID# 589). Moore immediately grabbed the barrel. (Doc. 37, Moore

Dep., PAGE ID# 589). Officer Scott then fired her weapon and shot Hicks. (Doc. 36,

Scott Dep., PAGE ID# 434). Hicks immediately fell to the ground. (Doc. 38, Schneider

Dep., PAGEID# 707). Before Officer Scott shot Hicks, none of the officers said anything

to Hicks. (Doc. 37, Moore Dep., PAGE ID# 592).

Officer Schneider attempted to roll Hicks over and handcuff him. (Doc. 38,

Schneider Dep., PAGEID# 817). Officer Schneider explained in his deposition:

> While I was attempting to get ahold of him and put handcuffs on him, I
> heard a voice upstairs who called out. So I had to step back, redrew my
> firearm, called that individual to the top of the stairs, ended up going up,
> getting him, and detaining him with a pair of handcuffs, as well, and
> walking him down and out into the hands of another officer.
>
> . . . At some point, called on the radio -- I called on the radio -- requesting
> fire personnel, supervisors, explaining we have had an officer-involved
> shooting . . .

(Doc. 38, Schneider Dep., PAGEID# 707-708).

Officer Loreaux had been outside in the yard, but he came into the house and up

the stairs as soon as he heard the gun shot. (Doc. 42, Loreaux Dep., PAGE ID# 1048).

When he came to the landing near the top of the stairs, Officer Loreaux saw a "lifeless

body" and "a lot of blood." (Doc. 42, Loreaux Dep., PAGE ID# 1050-1051). Officer

Schneider handed Officer Loreaux the rifle. (Doc. 42, Loreaux Dep., PAGE ID# 1055).

Officer Loreaux checked the rifle to make sure it was unloaded. (Doc. 42, Loreaux

Dep., PAGE ID# 1055). Officer Loreaux left the rifle on the landing, and went back

outside for some crime scene tape. (Doc. 42, Loreaux Dep., PAGE ID# 1055). Officer

Loreaux saw that another officer had arrived and was getting the crime scene tape, so

he went back inside. (Doc. 42, Loreaux Dep., PAGE ID# 1055). When Officer Loreaux

returned to the landing less than a minute later, he asked about Hicks' condition, the other officers told him that Hicks was confirmed dead. (Doc. 42, Loreaux Dep., PAGE ID# 1056). Officer Loreaux is an Army veteran, EMT and experienced combat medic. (Doc. 42, Loreaux Dep., PAGE ID# 973, 1060). Officer Loreaux did not attempt to assist Hicks with medical attention. (Doc. 42, Loreaux Dep., PAGE ID# 1056). Officer Loreaux did not see anyone administer first aid to Hicks. (Doc. 42, Loreaux Dep., PAGE ID# 1060).

In the Second Amended Complaint, Plaintiff brings the following claims: (1) excessive force in violation of the Fourth and Fourteenth Amendment under 42 U.S.C. § 1983; (2) illegal search and seizure in violation of the Fourth and Fourteenth Amendment under 42 U.S.C. § 1983; (3) violation of substantive due process in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 based on a state-created danger;[4] (4) violation of substantive due process in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 based the denial of medical care; (5) failure to train, supervise, monitor and discipline employees under 42 U.S.C. § 1983; (6)

---

[4]Plaintiff did not respond to Defendants' Motion for Summary Judgment as to Plaintiff's due process claim based on the state-created danger theory. In the Second Amended Complaint, Plaintiff alleged that Defendants Scott, Moore and Schneider created or increased the risk that Hicks would be exposed to an act of violence. (Doc. 39, PAGEID# 908). Under the state-created danger theory of due process liability, a plaintiff must meet "three important requirements: an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen v. Beecher Comm. Schools*, 433 F.3d 460, 464 (6th Cir. 2006) (citations omitted). In instances where there is opportunity for "reflection and unhurried judgments," a plaintiff must show that the state actor acted with deliberate indifference. *Id.* at 469 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003)). The Court notes that based on the facts of this case, the deliberate indifference analysis conducted herein with regard to Plaintiff's due process claim based on a denial of medical care would be the same for Plaintiff's claim based on the state-created danger theory.

municipal liability under 42 U.S.C. § 1983; (7) wrongful death under Ohio law;[5] and (8) battery under Ohio law.[6]  (Doc. 39).  Plaintiff brings her claims against Officers Scott, Moore and Schneider in their individual and official capacities.

Defendants move for summary judgment on the basis that Officers Scott, Moore and Schneider are entitled to qualified immunity; the City is not subject to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); and the City is entitled to immunity under Ohio's Political Subdivision Tort Liability Act.

## II.   ANALYSIS

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In reviewing a summary judgment motion, courts are required to view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.

---

[5]Plaintiff did not respond to Defendants' Motion for Summary Judgment as to Plaintiff's claim for wrongful death under Ohio law.

[6]In her response to Defendants' Motion for Summary Judgment, Plaintiff refers to her claim for "assault and battery" (Doc. 44, PAGEID# 1154), but in the Second Amended Complaint, Plaintiff has only plead a claim for battery under Ohio law.  (Doc. 39, PAGEID# 914).

*Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). In the qualified immunity context, "'this usually means adopting . . . the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (quoting *Scott*, 550 U.S. at 378, 380).

## B. <u>Section 1983</u>

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001) (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) and *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992)).

## C. <u>Qualified immunity</u>

The doctrine of qualified immunity protects government officials acting in their official capacities from damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity involves a two-step inquiry: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). This court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567-68 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

### D.  **Excessive force**

Plaintiff claims that Officer Scott's use of lethal force violated his Fourth Amendment right to be free of excessive force by police.  Plaintiff does not challenge dismissal of this claim against Officers Moore and Schneider.

Excessive force claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Reasonableness is to be determined with "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding

situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007); *see also Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (quoting *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)) ("It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.").

Plaintiff argues that Defendant Scott fired on Hicks immediately upon sight of a weapon without determining that Hicks actually posed a threat. Plaintiff relies on a statement from Officer Schneider which was made during the investigation that followed the shooting. (Doc. 38, Schneider Dep., PAGE ID# 783). Plaintiff points out that Schneider used the words "slowly and nonchalantly" to describe the way in which Hicks came down the stairs. (Doc. 38, Schneider Dep., PAGE ID# 783). Plaintiff also relies on a statement by Schneider to investigators that Hicks was "panning [the gun] from left to right. He's coming in and he's turning like this. Pans past Officer Scott." (Doc. 38, Schneider Dep., PAGE ID# 784). Plaintiff maintains that this establishes that Hicks was not moving aggressively and did not point the gun at Officer Scott or any of the officers.[7]

However, Officer Schneider clarified in his deposition that Hicks "panned and pointed [the gun] at Officer Scott at some point, but I think it was when Officer Moore grabbed the gun and pulled the barrel away from Officer Scott, it ended up being

---

[7]Plaintiff claims that it is disputed whether Hicks came to the door with a rifle at all based on the testimony of Robert Boggs, who was staying with Hicks on the night Hicks was shot. Hicks was on the third floor when the shooting took place. Hicks states in an affidavit that he never saw Hicks with a rifle that night, nor did he see a rifle at the scene immediately after the shooting. (Doc. 44-5). However, it is not clear whether Boggs had an opportunity to see the gun. He states that before the shooting took place he had laid down and was "getting ready to fall asleep." (Id.) He explains that "the next thing I heard was a gunshot." (Id.) After the shooting, officers secured the rifle and removed it from the scene before Boggs was brought down from the third floor. (Doc. 37, Moore Dep., PAGEID# 539, 595-96).

pointed at me . . when the shot was fired [by Officer Scott]." (Doc. 38, Schneider Dep., PAGE ID# 785-786). Officer Schneider testified that the time between when Hicks opened the door and Officer Scott shot Hicks was "two to three seconds, at most." (Doc. 38, Schneider Dep., PAGE ID# 787).

Officer Moore also testified the incident occurred in a matter of "a few seconds." (Doc. 37, Moore Dep., PAGE ID# 594). Officer Moore testified about grabbing the rifle from Hicks:

Q. . . . . So you reached over the top of [the rifle]?

A. Yes. I grabbed it. Well, not – I grabbed it like – I mean I just grabbed it like this (indicating).

Q. Okay. And what direction did you move it?

A. I pulled it toward me.

Q. Okay. And was there any kind of a struggle between you and Mr. Hicks?

A. I don't know. I mean, it was – it seemed like when I was – when I was reaching for it, the shot went – I heard the shot go off. And then I looked down, and I had the rifle in my left hand.

Q. In your left – I just realized that you are gesturing – you are making that movement with your left hand?

A. Yeah.

Q. Are you left-handed?

A. No. But I'm not going to grab the rifle with my gun hand.

(Doc. 37, Moore Dep., PAGE ID# 590-591). Officer Moore testified that he reached for the barrel of the rifle "because if I didn't, I mean, I figured – I thought – I mean, if he would have fired the rifle, it would have killed Doris. I mean, even with a rifle that size, at that distance, I mean, it's a kill shot." (Doc. 37, Moore Dep., PAGE ID# 609-610).

Finally, Officer Scott testified: "And all of a sudden the door opens and I see a gun in my face like this (indicating). I see a hand and a gun. I see the gun go up and then I fire my weapon. And that was pretty much it." (Doc. 36, Scott Dep., PAGEID# 367).

"[T]he fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010) (citing *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008)). However, as the Sixth Circuit has recently observed, "[t]ime and time again, we have rejected Fourth Amendment claims in this setting—when the officers used deadly force only after the suspects had aimed their guns at the officers or others." *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016) (collecting cases upholding use of deadly force where suspect pointed a gun at the officer or others); *see also Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (same).

Moreover, the officers did not have to wait for Hicks to raise his gun before employing deadly force. *Thornton v. City of Columbus, Ohio*, 727 F. App'x 829, 838 (6th Cir. 2018) (citing *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action.")); *see also Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 366 (6th Cir. 2017) (rejecting a "categorical rule that force can only be reasonable if a suspect raises his gun."). Instead, "[w]hether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances." *Thomas*, 854 F.3d at 366 (citing *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are

all inquiries crucial to the reasonableness determination.")).

Plaintiff maintains that the circumstances of the encounter between Hicks and Officers Scott, Moore and Schneider do not justify the reflexive use of deadly force. Plaintiff explains that Officer Scott was required to at least give some type of command to Hicks or make some effort to determine if Hicks posed an immediate threat to her own safety or the safety of the other officers.

This Court recognizes that the Sixth Circuit has made it clear that "[w]here a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive." *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 534–35 (6th Cir. 2006)). However, the Sixth Circuit has also explained that the reasonableness of deadly force is to be based on "the shooting itself and the few moments directly preceding it." *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016) (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)). This is because under Sixth Circuit precedent, courts must view excessive force claims in segments. *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004); *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). "That is, the court should first identify the 'seizure' at issue here and then examine 'whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.'" *Id.* (quoting *Dickerson*, 101 F.3d at 1161)).

There is nothing in the record indicating that Officer Scott unreasonably placed herself in harm's way. Hicks was behind a closed door, and Officer Scott did not know

Hicks had a gun. The officers were there to speak to Hicks about the statements made by Norman and Jones that Hicks had threatened to kill them. Under the circumstances, Officer Scott did not have an obligation to identify herself as a police officer. *See Dickerson*, 101 F.3d at 1161-1162 (citing with approval *Drewitt v. Pratt*, 999 F.2d 774, 778-780 (4th Cir.1993) (rejecting a claim that an officer who resorts to deadly force in self-defense nevertheless violates the Fourth Amendment if he unreasonably provokes the shooting by failing properly to identify himself as a police officer)). When the door opened, Officer Scott suddenly saw Hicks with a rifle pointed directly at her from a close proximity. In the face of a rapidly unfolding situation, Officer Scott had probable cause to believe that Hicks posed a serious physical threat to both her and Officers Moore and Schneider. Based on the circumstances, Officer Scott's actions were objectively reasonable "[i]rrespective of any errors that contributed to the circumstances" that preceded the shooting. *See Presnall*, 657 F. App'x at 512 (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 915 (6th Cir. 2009)).

This Court concludes that even viewing all facts in the light most favorable to Plaintiff, summary judgment is granted as a matter of law on Plaintiff's claim for excessive force in violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983, both on the merits and pursuant to the defense of qualified immunity.

### E. Unlawful entry

Plaintiff claims that Defendants violated Hicks' Fourth Amendment rights when Officers Scott, Moore and Schneider unlawfully entered his home during the course of their investigation.

It is well-settled that the Fourth Amendment protects against unreasonable

intrusions into areas where one has a reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 578 (6th Cir. 2005).

This Court must engage in a two-part inquiry to determine whether a "reasonable expectation of privacy" exists. *See Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). First, "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and (2) "is society willing to recognize that expectation as reasonable?" *Widgren*, 429 F.3d at 578 (quoting *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)). "Assessing the degree of intrusion requires addressing both the methods used and the purpose for the intrusion." *Id.* at 583.

The Sixth Circuit has long recognized "a tenant in a locked apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public." *United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976). In *United States v. Carriger*, the Sixth Circuit held that a tenant in an apartment building had a reasonable expectation of privacy in common areas not open to the general public where a government agent entered a locked building by slipping into the building without permission when some workmen were leaving. 541 F.2d at 548, 550. Similarly, in *United States v. Kimber*, the Sixth Circuit found a reasonable expectation of privacy in a lobby area where the apartment building was locked and police forced the door open. 395 F. App'x 237, 248 (6th Cir. 2010).

However, the Sixth Circuit has held that normally protected private space, such as a common hallway of a duplex, loses its reasonable expectation of privacy, when the

individual leaves the door unlocked and ajar. *United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006). The court explained: "A person has an expectation of privacy if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). The court instructed that in analyzing whether a subjective expectation of privacy is objectively reasonable, a court is to consider the following factors:

> (1) whether the defendant was legitimately on the premises; (2) his proprietary or possessory interest in the place to be searched or the item to be seized; (3) whether he had the right to exclude others from the place in question; and (4) whether he had taken normal precautions to maintain his privacy. *See United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).

*Id.* In applying these factors to the case before it, the court explained:

> There is no question that Dillard, as a tenant, had a possessory interest in the common hallway and stairway of his duplex and the right generally to exclude anyone who was not a tenant. But because Dillard made no effort to maintain his privacy in the common hallway and stairway, he did not have an objectively reasonable expectation of privacy in those areas. Both doors on the first floor were not only unlocked but also ajar. By not locking the duplex's doors, Dillard did nothing to indicate to the officers that they were not welcome in the common areas.

*Id.* The court noted "without being able to pass through the hallway and stairway, there was no visible way for the police or anyone else to alert the duplex tenants of their presence." *Id.* The court explained there was no intercom system or doorbell. *Id.*

In *United States v. Kimber*, the Sixth Circuit found a criminal defendant's expectation of privacy in a lobby area was objectively reasonable where the apartment building was locked and police forced the door open. 395 F. App'x 237, 248 (6th Cir. 2010). The court explained that the back door to the apartment building was equipped with a key pad security lock, but the door could be opened by kicking the door at the

bottom and pulling it open. *Id.* at 241, 247. However, the court noted that there was no evidence that the defendant knew or should have known that the lock could be circumvented in this manner, or that the lock's fallibility was common knowledge to residents of the apartment. *Id.* at 247.

In *United States v. King*, the Sixth Circuit found a defendant in a criminal case had a legitimate expectation of privacy in the unlocked basement area of two-family dwelling. 227 F.3d 732, 748 (6th Cir. 2000). The court concluded that the defendant had standing to challenge the search of the basement because the defendant had a reasonable expectation of privacy which would be recognized by society. *Id.* at 750. In conducting its analysis, the court considered "the unique nature of the two-family dwelling and the basement located therein, as well as the circumstances under which Defendant was using the basement." *Id.* (explaining that "[a]s the oft quoted phrase goes, 'the Fourth Amendment protects people, not places.'") (quoting *Katz*, 389 U.S. at 351, 88 S.Ct. 507)). The court noted that "the fact that this was a two-family dwelling as opposed to a multi-unit apartment building inures to Defendant's benefit in that it is more likely that he enjoyed a reasonable expectation of privacy in the basement area—*i.e.*, it is more likely that the basement area was not a 'common' area for purposes of Fourth Amendment protection." *Id.* at 749.

In this case, Defendants claim that Hicks was shot in a common hallway of an apartment building. Plaintiff claims that Hicks was shot in an interior hallway inside his apartment between his bedroom and his bathroom. Defendants do not contest that Hicks had a subjective expectation of privacy. There is also no dispute that Hicks was legitimately on the premises and had a possessory interest in the second-floor

apartment.  Instead, the key factor is whether Hicks took the kind of "normal precautions to maintain his privacy" that are needed to find that Hicks' subjective expectation of privacy was objectively reasonable.

The Court notes that the building at 1751 Chase is a multi-family house.  (Doc. 36, Scott Dep., PAGE ID# 367).  Officer Scott testified that when the officers first arrived at the house on the night of June 9, 2015, she noticed there was a front porch with a mailbox.  (Doc. 36, Scott Dep., PAGEID# 366).  Officer Scott does not remember if there was a "1" on the mailbox, but she knew from her experience in that neighborhood that the door on the front porch led to the first-floor apartment.  (Doc. 36, Scott Dep., PAGEID# 366-367, 395).  The officers went to the side door to reach the second-floor apartment where Hicks was living.  A photo of this door which was taken on the night Hicks was shot is attached as an exhibit to Defendants' Motion for Summary Judgment. (Doc. 41-1, Ex. 6D).  The photo shows a wooden door with a glass window which takes up the top half of the door.  The window is partially covered by a curtain and security bars.  There also appears to be two deadbolt-type locks on the door.  The exterior door does not have a doorbell, intercom button or door knocker.  (Doc. 44-6, PAGEID# 1218).  Just inside this exterior door is a hall area with two interior doors.  (Doc. 41-1, Ex. 6E).  There is no evidence in the record as to whether these two interior doors were locked.[8]  There are no other doors between the exterior door and the doors on the second floor.  (Doc. 41-1, Ex. 6H).  The stairs to the second floor are just inside the exterior door and lead directly to the second floor.  (Doc. 44-6, PAGEID# 1219).  Hicks' uncle, Robert Thompson, submitted an affidavit stating that Hicks "ordinarily kept the

---

[8]Officer Scott testified that the officers did not try these doors.  (Doc. 36, Scott Dep., PAGEID# 408).

Side Door locked and had a key to the lock." (Doc. 44-6, Thompson Aff., ¶ 16, PAGEID# 1210).

The Court finds that these facts do not demonstrate that Hicks took the "normal precautions to maintain his privacy" so that Hicks had an objectively reasonable expectation of privacy in the unlocked hallway and stairway. The officers did not force open a locked door. Even though Hicks' uncle stated that Hicks ordinarily kept the door locked, it was not locked on the night of June 9th so that the officers would have known that they were not welcome into what they thought was a common area. Even if Hicks had a subjective expectation that the area between the exterior door and the upstairs hallway was private and was not a common area, there were few objective indicators which would have alerted the officers that the area beyond the exterior door was private. There was no doorbell or intercom button near the exterior door. In the hall just inside the exterior door, there were two closed doors. It would not be unreasonable for the officers to believe that these two doors were apartment doors, which would indicate that this first-floor hall was a common area. On the second floor, there were more closed doors. It was not unreasonable for the officers to believe that these doors were apartment doors and the hallway on the second floor was also common area. Neither the first floor hall area or the second floor hall area contained furniture or any personal items which would indicate that these areas were private. These areas were simply empty halls with closed doors.

This Court concludes that even viewing all facts in the light most favorable to Plaintiff, summary judgment is granted as a matter of law on Plaintiff's claim for unlawful entry in violation of the Fourth Amendments under 42 U.S.C. § 1983, both on the merits

and pursuant to the defense of qualified immunity.

## F. Denial of medical care

Plaintiff claims that Defendants took no action to provide assistance to Hicks and their actions prevented Officer Loreaux, an experienced combat medic, from even assessing Hicks.

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while apprehended by police. *City of Revere v. Massachusetts Gen'l Hosp.*, 463 U.S. 239, 244 (1983).[9]  To sustain a cause of action for failure to provide adequate medical care, the plaintiff must establish that the defendants acted with deliberate indifference to serious medical needs.  *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)).  A claim for deliberate indifference to serious medical needs has both objective and subjective components.  *Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008).  This two-part analysis is as follows:

> The objective component requires showing the existence of a "sufficiently serious" medical need.  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Phillips*, 534 F.3d at 539.  In a deliberate-indifference claim based on delay of medical care, a constitutional violation arises if the injury in question is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," and the resulting need for treatment was "not addressed within a reasonable time frame."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899–900 (6th Cir. 2004).  To establish the subjective component, the plaintiff must "allege facts which, if true, would show that the official ... subjectively perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).  However, it is not

---

[9]The parties have not disputed that Hicks was a pretrial detainee for purposes of this analysis.

necessary to prove that the officer acted "for the very purpose of causing harm or with knowledge that harm will result." *Id.* (quoting *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970).

*Scozzari v. Miedzianowski*, 454 F. App'x 455, 464 (6th Cir. 2012).

"[W]here a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,'" the plaintiff can meet the objective prong by showing "that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899-900 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). "This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." *Id.*

There can be no doubt that Hicks had an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention. However, "the 'obvious malady' theory does not excuse a plaintiff from showing that he actually needed medical care." *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017). Even viewing the facts in the light most favorable to Plaintiff, there is no evidence that Hicks was struggling for life when Officer Loreaux came upstairs and was told that Hicks was dead.

In his recorded statement to internal investigators after the incident, Officer Schneider explained:

> The shot was effective, um, he literally um, I don't think there was any struggle for the rifle, he when the gunshot uh, took effect he literally as far as I can tell, let go of the gun and fell to the ground. Leaving the officer standing with the, you know holding the gun by the barrel. And he moved back, actually I told him to move back and put the gun, he took it and stuck it down here in this stairwell. Um, I stepped forward and then uh, once we realized he, he appeared to be struggling for his life at that moment. Um it was, it took effect and it was a um, he was not resisting in

any way, um I asked Officer Scott to put her firearm in her holster and I went down to try to handcuff the subject. There was blood um, squirting everywhere. In his arms and the floor was just covered with blood and I, I couldn't even get a good a handle on him and I got blood all over my hands trying to uh, turn him so I could put him in handcuffs and then we tried to administer some first aid.

At this point, I'm dealing with him I hear another voice up the stairs. And I start yelling up the stairs, you know, Cincinnati Police, you know, announce yourself. And kind of a faint voice answered, it sounded like he was back, maybe in another room. Uh, from the area that this subject had come from. And so I um, drew my, redrew my firearm and held that spot for a minute until we kinda regained composure and I asked Officer Scott who was pretty upset at that moment, to step down to the lower landing and where the firearm was, the rifle, and there was another officer I believe it was Loreaux, um, I know I'm skipping time here. There was, at some point we were putting it out on the radio and I really don't know how much time that took. Um, another officer came up and I asked to stand with the subject on the ground and I called for this subject in the attic to you know, keep his hands in plain view and come to where I can see him at the top of the stairs and he complied. I gave him some orders and came up the stairs and we were able to detain him.

(Doc. 38-1, PAGEID# 817-818). Officer Loreaux testified that "there was no signs of life in Mr. Hicks, either time that I was up there." (Doc. 42, Loreaux Dep., PAGE ID# 1059). The coroner's report shows that the shot from Officer Scott's gun had perforated Hicks' lungs and ascending aorta. (Doc. 44-12, PAGEID# 1279-1280).

These facts are distinguishable from *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005). In that case, Roger Owensby was beaten by police officers and placed in the back of a police cruiser. *Id.* at 599-600. Owensby was bleeding and one officer informed the other officers that Owensby may not be breathing. *Id.* at 600. Two other officers looked at Owensby and commented that he appeared to be hurting a great deal. *Id.* at 601. None of the officers provided medical care. *Id.* at 600-601. When a police sergeant arrived, he asked to check on the suspect, and discovered that Owensby was not breathing. *Id.* at 600. Owensby was then given CPR, but was not

resuscitated, and was later pronounced dead at the hospital. *Id.* The coroner indicated his death resulted from "asphyxiation during restraint attempts." *Id.* The Sixth Circuit found the officers were deliberately indifferent to Owensby's medical needs, noting that "each officer viewed Owensby in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later, when Sergeant Watt checked on Owensby and discovered that he was not breathing." *Id. Accord Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (finding deliberate indifference where even though officers saw that the decedent had stopped breathing, they did not provide first aid and left him on the ground for a "prolonged period" while they discussed the absence of fire personnel).

The facts of this case are more analogous to another case which was before this Court. In *Thomas v. City of Columbus*, this Court explained:

> This is a case in which an officer, present at a still-active, unsecured crime scene with one or more individual suspects unaccounted for, took cover and summoned medical personnel but did not attempt to provide medical care to a man he believed to be dead. The Constitution requires reasonableness, not that an officer put himself at risk to provide what appears to be futile aid. Plaintiff has directed this Court to no precedent that established at the time of the events involved that an officer is constitutionally compelled to engage in such conduct.

*Thomas v. City of Columbus*, No. 2:14-CV-906, 2016 WL 1090963, at *11 (S.D. Ohio Mar. 21, 2016), *aff'd*, 854 F.3d 361 (6th Cir. 2017) (holding that the officer "did not violate the Constitution by failing to render aid when doing so appeared both dangerous and futile.").

Even if it turned out that the officers were wrong, and Hicks was in fact still alive when Officer Loreaux came up the stairs, the failure to recognize that Hicks was not dead did not amount to deliberate indifference. As the Sixth Circuit has explained:

> Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970; *see also LeMarbe v. Wisneski*, 266 F.3d 429, 435 (6th Cir. 2001). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895-96 (6th Cir. 2004). Here, the record does not include circumstances clearly indicating the existence of a substantial risk of serious harm. There is no evidence that Hicks was struggling for life. Officer Loreaux did not observe any signs of life either time he came upstairs. It was reasonable for Officers Scott, Moore, and Schneider to believe that Hicks had died and providing aid would be futile. There is nothing in the record which would indicate that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the Defendants ignored that risk." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

This Court concludes that even viewing all facts in the light most favorable to Plaintiff, summary judgment is granted as a matter of law on Plaintiff's claim for denial of medical care in violation of the Fourteenth Amendment under 42 U.S.C. § 1983, both on the merits and pursuant to the defense of qualified immunity.

## G. Failure to train, supervise and discipline

Plaintiff claims that the unlawful and warrantless entry into Hick's home was proximately caused by the failure of the City to adequately train, supervise and discipline its officers.

Because no constitutional violations occurred, Plaintiff's failure-to-train claim against the City necessarily fails. *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 367 (6th Cir. 2017) (affirming summary judgment on failure-to-train claim brought against municipality because "no constitutional violations occurred" and "[n]o constitutional violation means no municipal liability"); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 450 (6th Cir. 2011) (holding that because the jury found that the officers did not use excessive force, the jury was prohibited from considering the liability of the city for a failure to train).

This Court concludes that summary judgment is granted on Plaintiff's claim for failure to train, supervise and discipline under 42 U.S.C. § 1983.

**H. State law claims**

Plaintiff brings a claim of battery under Ohio law. Defendants claim that Ohio Revised Code § 2744.03(A) provides them with immunity from these claims.

Ohio's Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744, addresses when political subdivisions, their departments and agencies, and their employees are immune from liability for their actions. *Lambert v. Clancy*, 125 Ohio St.3d 231, 927 N.E.2d 585, 588 (Ohio 2010). A three-tiered analysis is used to determine whether a political subdivision is immune from tort liability:

> First, R.C. 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages. In setting out this rule, R.C. 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions and states that the general rule of immunity is not absolute, but is limited by the provisions of R.C. 2744.02(B), which details when a political subdivision is not immune. Thus, the relevant point of analysis (the second tier) then becomes whether any of the exceptions in R.C. 2744.02(B) apply. Furthermore, if any of R.C. 2744.02(B)'s exceptions are found to apply, a consideration of the application of R.C. 2744.03 becomes relevant, as the third tier of analysis.

*Greene Cty. Agric. Soc. v. Liming*, 89 Ohio St. 3d 551, 556–57, 733 N.E.2d 1141, 1146 (Ohio 2000) (citation omitted).

One exception provides that employees are not entitled to immunity when they act "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Under Ohio law, recklessness is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Argabrite v. Neer*, 149 Ohio St.3d 349, 75 N.E.3d 161, 164 (2016)). This Court has determined that Officer Scott's use of force was objectively reasonable. Accordingly, the Court finds that Officer Scott is entitled to immunity under Ohio Revised Code § 2744.03(A)(6)(b). *Accord Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (explaining that statutory immunity defense stands or falls with federal qualified immunity defense).

This Court concludes that summary judgment is granted on Plaintiff's claim for battery under Ohio law.

## III.  **CONCLUSION**

Based on the foregoing, Defendants Motion for Summary Judgment (Doc. 41) is **GRANTED**. There appearing to be no more matters for decision before this Court, this matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT